UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

CRAIG BENTON,                                          06 Civ. 3360

                    Petitioner,                        OPINION

    -against-

WILLIAM BROWN, SUPERINTENDENT,
EASTERN CORRECTIONAL FACILITY,

                    Respondent.

------------------------------------X

A P P E A R A N C E S:

        Petitioner

        Pro se

        Attorneys for Respondent

        ELIOT SPITZER
        Attorney General of the State of New York
        120 Broadway
        New York, New York 10271
        By:   Alyson J. Gill, Esq.
              Lisa Fleischmann, Esq.

**Sweet, D.J.**

Craig Benton ("Benton" or the "Petitioner") has filed his habeas corpus petition pursuant to 28 U.S.C. § 2254 alleging that he is being held in state custody in violation of his federal constitutional rights. Petitioner's state custody arises from a judgment of conviction entered on December 18, 2002, in the Supreme Court of the State of New York, New York County, convicting him of Assault in the First Degree (New York Penal Law (hereinafter, "Penal Law") § 120.10(1), Robbery in the First Degree (Penal Law § 160.15(1)) and Burglary in the Second Degree (Penal Law § 140.25(1)(b)). Petitioner was sentenced, as a second felony offender, to concurrent, determinate prison terms of 15 years on each count. Petitioner is currently incarcerated at Eastern Correctional Facility pursuant to this judgment of conviction. For the reasons set forth below, the petition is denied.

## Prior Proceedings

A New York County Grand jury charged Petitioner with Attempted Murder in the Second Degree (Penal Law §§ 110.10/125.25), two counts of Assault in the First Degree (Penal Law § 120.10(1)), Robbery in the First Degree (Penal Law §

1

160.15(1)), and two counts of Burglary in the Second Degree (Penal Law § 140.25(1)(b)) (Indictment No. 3151/01). On April 8, 2002, a Huntley/Dunaway/Payton hearing was held before Justice Charles Tejada, after which the court denied Petitioner's motion to suppress his statement to the police. Petitioner proceeded to trial before Justice Tejada and a jury on April 10, 2002. On April 18, 2002, Justice Tejada declared a mistrial after the jury deadlocked. On November 14, 2002, Petitioner proceeded to a second jury trial before Justice Joan Sudolnik.

Petitioner's appointed appellate counsel, Robert S. Dean of the Center for Appellate Litigation, filed a brief on his behalf in June 2004. Counsel argued that: (1) Petitioner's arrest violated Payton v. New York, 445 U.S. 573 (1980), where Petitioner was brought from his home to the precinct for questioning without a warrant; and (2) the court erred in finding that Petitioner's counsel, in making an application pursuant to Batson v. Kentucky, 476 U.S. 79 (1986), had failed to establish a prima facie case of discrimination, where the prosecutor had exercised peremptory challenges to the only two African-American female jurors on the panel.

On December 7, 2004, the Appellate Division, First Department, affirmed Petitioner's conviction. People v. Benton, 13 A.D.3d 97 (N.Y. App. Div. 2004). The Court found no Payton violation, because "the police simply knocked on [Petitioner's] door and [Petitioner] admitted them to his apartment. Furthermore, [Petitioner] then voluntarily agreed to leave his apartment and accompany the police to the station." Benton, 13 A.D.3d at 97.The court found "no coercive circumstances suggesting" Petitioner's submission to authority when he "let the police into his apartment or when he agreed to go with them." Id.

Additionally, the Appellate Division found that the trial court had properly denied Petitioner's "unelaborated" Batson motion. Id. at 98. Petitioner's "unpersuasive and unsupported numerical argument failed to raise an inference of discrimination to establish a prima facie case." Id.

Petitioner sought leave to appeal to the Court of Appeals on the issues raised in the direct appeal. The prosecutor opposed the application, and on January 13, 2005, the Court of Appeals issued a certificate denying Petitioner's leave application. People v. Benton, 4 N.Y.3d 761 (2005).

3

Petitioner's conviction became final ninety days later, on April 13, 2005, the date his time to seek a writ of certiorari to the Supreme Court expired. Williams v. Artuz, 237 F.3d 147, 151 (2d Cir. 2001), cert. denied, 534 U.S. 924 (2001). Petitioner had one year from that date, or until April 13, 2006, to file his petition for habeas relief. 28 U.S.C. § 2244(d)(1). Petitioner filed his petition on or about April 7, 2006 and the petition is timely. After the People filed an Answer, the petition was marked fully submitted on November 2, 2006.

## The Trial Testimony

According to the People, on the evening of May 9, 2002, Petitioner entered Prop Dependable Services ("Prop Dependable"), a messenger trucking company and storage facility located on West 28th Street in Manhattan, at which he had previously been employed. There, he beat Barbara Gilbert ("Gilbert"), the night manager, with a chair, knocking out her teeth and causing a facial fracture and lacerations to her face and head. He stole her wallet, and fled. At the hospital, Gilbert named Petitioner as her assailant. He was arrested four days later, and at the precinct, he gave the police an alibi regarding his whereabouts the night that Gilbert was attacked.

4

In May 2001, Gary Ackerman ("Ackerman") was the owner of Prop Dependable (T: 84-85).[1] Ackerman employed 46-year-old Gilbert as the night manager (T: 86, 141).[2] Gilbert worked from 6:00 p.m. to 8:00 a.m. (T: 86-87, 141). She worked alone after the day dispatcher left at around 7:00 p.m. (T: 142).

Ackerman hired Petitioner in the summer of 2000 as a dispatcher (T: 89-90). Gilbert, who worked in the office next door to the dispatcher room, would usually greet Petitioner when she came to work (T: 148, 177-78). Gilbert recalled having had one conversation with Petitioner during which Petitioner asked if he could borrow $20 on an evening when they were the only two people at work (T: 178, 198). Ackerman fired Petitioner in December 2000 after learning that he had tried to borrow money from a client (T: 90, 92, 110, 124).

On May 9, 2001, Gilbert went to work as usual (T: 150, 174). She carried a wallet containing about $90, a bank card, and identification (T: 160). Sometime between 7:00 and 8:00 p.m., Gilbert answered a telephone call from someone who identified himself as "Jerry from Spectrum," who stated that he would bring his truck in at 9:00 p.m. (T: 151, 188, 193).

---

[1] Parenthetical references to "T" are to the pages of the trial transcript; references to "VD" are to the voir dire proceedings.

[2] In 1977, when Gilbert was 20 years old, she stole a police car while drunk and drove it into a ditch; in 1979, she stole a car wheel. She spent time in jail for each offense (T: 159-60, 185).

After the brief call, Gilbert thought to herself, "this sounds like Craig's voice, I should call Gary" (T: 152, 174, 188). Gilbert was certain it was Petitioner's voice because she had heard him speak "many times," and "knew the sound of his voice" (T: 152, 176). Gilbert felt she should notify Ackerman about the call because he expected her to call him if any work-related problems arose. In addition, Ackerman had told her that if Petitioner "showed up, don't let him in" (T: 144, 153, 175, 184, 188). Nonetheless, Gilbert did not call Ackerman, probably because she was too busy (T: 153, 186).

At about 9:00 p.m., Officer Dawn Fantini received a radio call directing her to 229 West 28th Street (T: 203-04). When she arrived, she found Gilbert on a front stoop being treated by paramedics (T: 204). Gilbert had "severe swelling" to the left side of her face, her left eye was shut, her bottom lip was bleeding, she was missing teeth and her ear was cut. She also had a four-inch vertical cut on the back of her head (T: 204). Gilbert told Officer Fantini her name and that she lived in Brooklyn. Gilbert was then taken by ambulance to Bellevue Hospital, accompanied by Officer Fantini (T; 206, 218, 220).

6

Dr. Phillip Levy examined Gilbert at the Bellevue Emergency Room (T: 57). Gilbert's left eye was swollen shut, she had a possible orbit fracture and she had sustained lacerations to her lip and to the back of her head. She was also missing several teeth (T: 56, 74, 80). When she arrived at the emergency room, Gilbert appeared "significantly confused and disoriented" (T: 63). Although Gilbert was conscious, knew who she was and realized that she was in a hospital setting, she had "no idea of the date, time or year" (T: 58-59, 60, 61, 81). A CT scan later determined that she had a serious intracranial injury (T: 61).

In the emergency room, Gilbert told Dr. Levy and Officer Fantini, "It was Craig, he hit me with a chair" (T: 59, 208). Gilbert told Officer Fantini that "Craig" was black, tall and about 32 years old (T: 209-10). Officer Fantini then asked Gilbert where she used to work with "Craig." Gilbert spoke three words, but Officer Fantini could only make out the word "dependable" (T: 209).

After speaking with Gilbert, Detective Rice and Office Fantini went to 229 West 28th Street, where Officer Fantini noticed that there was a store nearby named "Prop Dependable" (T: 211, 274). Detective Rice entered the store, walked

7

upstairs and saw a broken chair and blood in the cubicle area (T: 275).

The scene was processed by the Crime Scene Unit, and Detective Rice called Gary Ackerman, informing him that someone had been hurt at the office (T: 95, 277). Ackerman arrived shortly afterwards and, once the Crime Scene Unit had finished processing the premises, Ackerman went upstairs into the offices with Detective Rice (T: 95, 277, 313). Ackerman observed that the door to his own office, which he usually locked, had been forced open (T: 98, 130). Inside the dispatcher's office, the file cabinet was open (T: 99, 278, 364).

Prop Dependable had hidden surveillance cameras on the premises. One pointed down the stairs toward the front entrance, two toward the offices, and one toward the dispatcher's room (T: 104, 280). The split-screen, freeze-frame video taken the evening of the incident at 8:32 p.m. showed Gilbert walking down the stairs, opening the front door, and walking back up with a man (T: 106, 111-12). The man appeared to have dark skin (T: 112). The two walked into the cubicle area (T: 108). The tape next showed the man leaving the cubicle area, going down the stairs, and out the front door (T: 108-09). The height, weight, and posture of the person

were "very similar" to Petitioner's (T: 110-11, 113-14, 127, 131).

After conducting computer checks, Detective Rice obtained several addresses for Petitioner. Two of them were in Central Islip, Long Island; however, no one was there when Detective Rice visited those locations (T: 281). Detective Rice also went to another address, 558 West 184th Street, where Petitioner's wife and child were living, but Petitioner was not there at the time (T: 283, 288).

At approximately 5:00 a.m., on May 13, 2001, Detective Rice learned that Petitioner was at the 10th Precinct (T: 292, 315). Detective Rice went to the station house, where he read the Miranda warnings to Petitioner (Rice: 293-97). Petitioner gave the following statement: "Took train Wednesday, two-twenty p.m., Penn to Central Islip; arrived three-twenty-five p.m., and met with a friend, returned Friday night, two or three a.m." (T: 298-300). Based on his statement, Petitioner would have been in Central Islip, about 50 miles away, at 8:30 p.m. on May 9th, the time Gilbert was attacked (T: 300). Detective Rice later verified the information in Petitioner's statement was correct,

9

except that Petitioner took the train to Islip on Thursday, not Wednesday, the day of the assault (T: 318).[3]

At trial, Gilbert could not recall opening the door to the building, being attacked, or talking to the police or doctors afterwards. She recalled being at the hospital, feeling numb and being "pretty black and blue," missing several teeth and realizing that her wallet was gone (T: 154-55, 160-61, 179-81, 187, 199). Gilbert's amnesia about the "actual assault" was consistent with a "significant enough head injury" causing a loss of consciousness (T: 63-64, 68, 73). It was medically "possible" for Gilbert to remember certain events when she was in the emergency room, but to lose her memory of them afterwards (T: 70-71).

---

[3] The parties stipulated that a court reporter would have testified, if called, that at a preliminary hearing, Petitioner had stated that he had been "walking around" on "an afternoon" when he encountered for the first time a woman named "Iris" and that the two went to her home in the Bronx, which was located at 1460 College Avenue (T: 383). The parties also stipulated that during Petitioner's Grand Jury testimony, he stated that he had made one telephone call from Iris's apartment to his cousin Terrance, who lives on 150th Street in Manhattan (T: 385-86).

Detective Rice interviewed Iris Hazim, who lived at 1460 College Avenue, Apartment 1-H, in the Bronx, and obtained her telephone number (T: 301-02). Verizon telephone records showed that a series of telephone calls was made on May 9, 2001 from the that number at apartment 1-H at 1460 College Avenue (T: 325, 333, 338, 341). Among them was a call at 3:23 p.m. to a number belonging to Ellen Harrison in Central Islip. Two others were to the dispatcher number at Prop Dependable, one at 6:53 p.m., lasting 4 seconds, and the other at 7:27 p.m., lasting twenty seconds (T: 339-40). Ten calls were made to the new claims department at the unemployment insurance office of Department of Labor between 3:07 and 7:13 p.m. (T: 338).

10

Sometime after May 9, 2001, Joyce Diaz ("Diaz"), who lived at 620 West 183rd Street, found Gilbert's wallet in a garbage can outside her building and turned it over to the police (T: 224, 226-27, 285). It contained Gilbert's identification cards, but no money (T: 229, 285).

Petitioner testified on his own behalf. He had been convicted in 1985 and 1990 of felonies (T: 406, 429). Before working for Prop Dependable, he had worked at various jobs (T: 406). Petitioner was six feet six inches tall and weighed 285 pounds (T: 441).

Petitioner testified that he knew that the company had video surveillance (T: 441). While his shift overlapped with Gilbert's shift, Petitioner testified that he never developed any animosity toward Gilbert and she had no reason to have hard feelings against him (T: 449, 452).

According to Petitioner, Ackerman fired Petitioner in November 2000 because he needed someone who "would be there every day." Ackerman said nothing to him about his borrowing money from a client, which Petitioner, in any event, never did (T: 409, 458). After he was fired, Petitioner collected unemployment, Social Services benefits and food stamps that

11

totaled about $1,800 per month, slightly more than his take-home pay at Prop Dependable, which was about $1,670 per month (T: 409-12). During May 2001, Petitioner was using cocaine every two or three weeks (T: 458, 460).

On May 9, 2001, Petitioner cashed an unemployment check and applied for a job at a lumber company (T: 415, 459). He walked in the neighborhood of 28th Street and Eighth Avenue and encountered a woman named Iris Hazim ("Hazim"), who invited him to her house in the Bronx (T: 416, 465). At her house, he and Hazim used about a gram or two of cocaine and had sex. Afterwards, Petitioner stepped out at about 7:00 or 7:10 p.m., tried unsuccessfully to buy more cocaine, settled for buying some marijuana instead, and returned around 7:30 p.m. He stayed with Hazim until about 10:00 a.m. the following day (T: 416, 418-21, 467, 470). Petitioner did not recall calling Laura Harrison ("Harrison"), a former girlfriend, or Prop Dependable while he was with Hazim (T: 482-83). After leaving Hazim the next day, he went to see his mother and then Harrison on Long Island (T: 421-22, 436). He returned from Long Island early Saturday morning (T: 422).

The following Sunday, the police came to Petitioner's apartment and asked him to accompany them to the police station

12

for questioning about an incident which had occurred where he used to work. They did not tell him that he was under arrest (T: 424). At the station, Petitioner falsely told Detective Rice that he had gone to Long Island the previous Wednesday, rather than Thursday (T: 425). Petitioner testified that he lied because he was embarrassed about cheating on his wife, Epiphania Benton, and using drugs (T: 425, 432). Petitioner, however, eventually told his wife that he had been with Hazim on May 9th (T: 426).

Petitioner testified that he did not recall calling Prop Dependable on May 9th, although he did occasionally call a friend there who worked as a dispatcher (T: 427). He did not recall making any calls to the Department of Labor from Hazim's apartment (T: 428). Petitioner stated that he did not go to Prop Dependable's offices on May 9th, encounter Gilbert there, or rob Prop Dependable or Gilbert (T: 421, 427, 429). Petitioner testified that he had no financial motive to rob Gilbert despite his cocaine habit (T: 487).

Epiphania Benton, Petitioner's wife, lived with him an apartment on 184th Street in Manhattan (T: 389-90). On May 9, 2001, the police visited the apartment, looking for her husband (T: 391, 397). She told the police that she had not seen

13

Petitioner since the previous day, when he left saying he intended to cash a check, go to a job interview, and then visit his mother in Long Island (T: 391). Only later did she learn from Petitioner that he had in fact spent the night of May 9th with Hazim (T: 393, 401, 402-04).

On November 22, 2002, Petitioner was found guilty of first-degree assault, first-degree robbery and second-degree burglary.[4] On December 18, 2002, Petitioner was sentenced as noted above.

## The Unlawful Arrest Claim is Barred

Petitioner claims, as he did on direct appeal, that the police violated the principles of Payton, by entering his home without a warrant and requiring him to accompany the officers to the precinct for questioning. Because Petitioner had a full and fair opportunity to litigate this Fourth Amendment claim, the claim is barred from habeas review by the doctrine of Stone v. Powell, 428 U.S. 465 (1976).

---

[4] The attempted murder charge was dismissed prior to trial and one of the first-degree assault charges (causing serious physical injury in the course of committing a felony) was not submitted to the jury. The two burglary counts were submitted in the alternative.

14

The law is well settled that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim," federal habeas corpus relief will not lie for a claim that evidence recovered through an illegal search and seizure was introduced at trial. Stone v. Powell, 428 U.S. at 482. The Stone doctrine "applies to bar habeas review of claims made under Payton." Leake v. Senkowski, 01 Civ. 7559 (SHS) (GWG), 2004 U.S. Dist. LEXIS 11939, at *53 (S.D.N.Y. June 30, 2004) (collecting cases). All Stone requires is that the State provide a petitioner the opportunity to litigate a Fourth Amendment claim. See McPhail v. Warden, Attica Correctional Facility, 707 F.2d 67, 69 (2d Cir. 1983). Thus, in order to receive habeas review of a Fourth Amendment claim, a Petitioner must demonstrate either that the state failed to provide any "correctives procedures" by which Fourth Amendment claims could be litigated, or that the State had such procedures in place, but that the Petitioner was unable to avail himself of those procedures "because of an unconscionable breakdown in the underlying process." Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992).

In his petition for habeas corpus relief, Petitioner does not contend that New York failed to provide appropriate corrective procedures to address his Fourth Amendment

allegations; nor could he, since "the 'federal courts have approved New York's procedure for litigating Fourth Amendment claims,'" embodied in New York's Criminal Procedure Law. Id. at 70 n.1 (quoting Holmes v. Scully, 706 F. Supp. 195, 201 (E.D.N.Y. 1989)). In fact, Petitioner took full advantage of this opportunity to litigate these issues when he challenged the legality of his arrest at a Huntley/Dunaway/Payton hearing. As a result of his motion, the court granted Petitioner a hearing at which Petitioner's counsel cross-examined Detectives Lynch and Rice and made substantial argument in support of suppression of his statements to the police.

Petitioner's suppression motion and the resulting hearing and decision constituted a "corrective procedure" to redress the alleged Fourth Amendment violations. Capellan, 975 F.2d at 70. As Petitioner took advantage of those procedures, there was no "unconscionable breakdown" in the state mechanism for evaluating suppression claims. Id. Petitioner thus received an opportunity for full and fair litigation of his Fourth Amendment claim in state court, and he is now barred from further review of this claim in this habeas corpus proceeding. See id.; Plunkett v. Johnson, 828 F.2d 954, 956 (2d Cir. 1987).

## The Rejection of the Batson Claim Was Not Constitutionally Defective

Petitioner contends that the trial court erred in denying his Batson application on the ground that counsel failed to establish a prima facie case of discrimination. However, Petitioner's counsel failed to make a sufficient record for Batson assessment. The Appellate Division's rejection of this claim as unelaborated, unpersuasive and unsupported was consistent with Supreme Court law and consequently, Petitioner is not entitled to habeas relief.

Jury selection consisted of three rounds of fourteen jurors and a fourth round consisting of four jurors. During the first round, the prosecutor exercised four peremptory challenges, to one man and three women, including a juror named "Ms. Alexis" (VD: 48). The record reveals only that Ms. Alexis lived in "[u]ptown Manhattan;" no record was made of the race of the prospective jurors on the first panel (VD: 18).

On the second panel were Valarie Edmundsen ("Edmundsen") and Jennifer Broome ("Broome"). Edmundsen lived in Harlem and had served four years earlier on a criminal jury that had reached a verdict, and she had also testified as a defense witness in an assault trial twelve years earlier (VD:

51). Broome lived on the Upper East Side and worked in marketing for a computer company (VD: 56). The prosecutor peremptorily challenged both women, and then the following occurred:

[DEFENSE COUNSEL]: Your Honor, I'll make a Batson application. There will be only two, there are two women of African American descent here and in the prior panel. Alexis and the People have challenged both of them [sic].

THE COURT: Well, what facts inference [sic] can you state to establish a prima facie case because the [P]eople are excluding membership in that group.

[DEFENSE COUNSEL]: They're the only two people of color that have been on this panel and both of them have been challenged by the DA and that make a prima facie case in and of itself.

[THE PROSECUTOR]: I disagree that the provocation [sic] has to be made with two jurors. I can't offer reason [sic] but for legal purposes I don't think the defense has met their burden.

THE COURT: Well, as of this state [sic], I don't think there is a prima facie showing. I know the People have also exercised to challenge other jurors, men and women who are not African American. So I don't know at this stage that the defense has established a prima facie case but we will see how it goes on successive ground [sic] (VD: 80-81).

During the third round of jury selection, the prosecutor peremptorily challenged two men and a woman, and in the fourth round of jury selection, the prosecutor made no challenges. The jury was comprised of six men and six women,

18

and one male alternate. No record of the races of the jurors and prospective jurors in the third or fourth rounds were made. Id. Petitioner did not renew his Batson motion.

Petitioner contends, as he did on appeal, that the Batson application was based on the prosecutor's peremptory challenges to Edmundsen and Broome. However, the People explained in their brief that Petitioner's motion was directed instead to the prosecutor's challenge to Ms. Alexis, from the first panel, and to Edmundsen or Broome, of the second panel. The Appellate Division found that counsel's claim was "unelaborated" and that counsel's "unpersuasive and unsupported numerical argument failed to raise an inference of discrimination sufficient to establish a prima facie case." Benton, 13 A.D.3d at 98.

Because Petitioner's claim was adjudicated on the merits in state court, Petitioner can only obtain habeas corpus relief by showing that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). With respect to the "contrary to" clause, the writ may issue in two circumstances: first, if the state court decision is contrary

19

to Supreme Court precedent on a question of law; and, second, if the state court decision addresses a set of facts "materially indistinguishable" from a relevant Supreme Court case and arrives at a result opposite to that reached by the Court. Williams v. Taylor, 529 U.S. 362, 405, 406 (2000). A state court decision involves an "unreasonable application" of Supreme Court precedent when the state court either "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts" of the case, or "unreasonably extends a legal principle from [the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407.

It is well established law that, under Batson, parties may not exercise peremptory challenges to exclude jurors "solely on account of their race." A three-step process is utilized to determine whether a Batson violation has occurred. At the first step, a defendant opposing the People's peremptory challenge must make a prima facie showing that the strike was racially based. Rice v. Collins, 546 U.S. 333, 338 (2006). To make this showing, the defendant must demonstrate that the prosecutor exercised peremptory challenges to exclude members of a cognizable racial group, and demonstrate "facts and other

relevant circumstances" sufficient to raise an inference that the prosecutor did so solely because of their race. Batson, 476 U.S. at 96. Significant among the relevant circumstances which may support an inference of discrimination are patterns of strikes against a cognizable racial group, and the prosecutor's questions and statements during voir dire and when exercising peremptory challenges. See Truesdale v. Sabourin, 427 F. Supp. 2d 451, 458 (S.D.N.Y. 2006); see also Tankleff v. Senkowski, 135 F.3d 235, 249 (2d Cir. 1998).

Only if a prime facie case of discrimination is found does the burden shift to the prosecutor to articulate race-neutral reasons for the challenges. Batson, 476 U.S. at 97. This second step of the process "does not demand an explanation that is persuasive, or even plausible. 'At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" Purkett v. Elem, 514 U.S. 765, 768 (1995) (quoting Hernandez v. New York, 500 U.S. 352, 360 (1991)). Once those reasons have been provided, the burden shifts back to the defendant to establish intentional discrimination by showing that the proffered race-neutral explanations were pretextual. Purkett, 514 U.S. at 767.

The Appellate Division correctly found Petitioner's counsel's Batson application to be "unpersuasive and unsupported" because the scant record fails to establish a pattern by the prosecutor of exercising racially-based strikes. Petitioner's counsel merely stated that the prosecutor had stricken the only "two women of African-American descent" (VD: 80-81). Counsel did not state, however, how many African-American men were on the panels; in fact, no record was made of the races of the potential jurors on the first two panels. Because Petitioner's counsel never renewed her Batson motion, she did not make a record as to the racial composition of the third and fourth panels. Defense counsel bears the burden to establish the factual and legal bases of a Batson challenge. See DeBerry v. Portuondo, 403 F.3d 57, 59 (2d Cir. 2005). By leaving an "unelaborated" record, counsel failed to raise an inference that the strikes were racially based. Thus, the Appellate Division's finding that counsel's motion was "unpersuasive and unsupported" was reasonable and supported by the record.

The record reflects that Petitioner's counsel failed to show "that the totality of the relevant facts gives rise to a discriminatory purpose." Johnson v. California, 545 U.S. 162,

168 (2005) (quoting Batson, 476 U.S. at 93-94). The record is not only considerably factually deficient, but it reflects no discriminatory intent by the prosecutor. On the first panel, the prosecutor challenged, apparently, two non-African-American women and a man (VD: 48). On the third round, he challenged two men and a woman of unknown race and ethnicity (VD: 112-13). Petitioner does not claim that the prosecutor's voir dire statements reveal any discriminatory intent, nor is any intent discernable in the prosecutor's questioning.

Moreover, assuming that the Batson challenge was directed to Edmundsen, because she indicated that she had, twelve years earlier, testified as a defense witness in a criminal assault trial, the prosecutor had a legitimate reason for exercising a peremptory challenge. With respect to Ms. Alexis and Broome, the record does not reflect which venire person provided certain answers. Consequently, the record is insufficient to make an informed determination, but the deficiency in the record is through no fault of the prosecutor.

In sum, the Appellate Division's determination that Petitioner's counsel failed to establish a prima facie case of discrimination is not contrary to, or based on an unreasonable

application of, Supreme Court law.    Consequently, Petitioner is
not entitled to habeas relief.

**Conclusion**

For the reasons set forth above, the petition for a
writ of habeas corpus is denied.    As Petitioner has not made a
substantial showing of the denial of a constitutional right, a
certificate of appealability will not issue.    28 U.S.C. § 2253;
see also United States v. Perez, 129 F.3d 255 (2d Cir. 1997);
Lozada v. United States, 107 F.3d 1011 (2d Cir. 1997).    Pursuant
to 28 U.S.C. § 1915(a)(3), it is hereby certified that any
appeal from this order would not be taken in good faith.
Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

It is so ordered.

**New York, N.Y.**
**March  6  , 2008**

**ROBERT W. SWEET**
**U.S.D.J.**

24